# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

JOSEPH ANTONETTI,

      Plaintiff

v.

E.K. MCDANIELS, et. al.,

      Defendants

Case No.: 3:16-cv-00396-MMD-WGC

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF No. 122

This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Defendants' Motion for Summary Judgment. (ECF Nos. 122, 122-1 to 122-34.) Plaintiff filed a response. (ECF Nos. 126, 126-1.) Defendants filed a reply. (ECF No. 128.)[1]

After a thorough review, it is recommended that Defendants' motion be granted.

## I. BACKGROUND

Plaintiff is an inmate incarcerated in the custody of the Nevada Department of Corrections (NDOC), however, he is currently housed out of state in New Mexico. He is proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Am. Compl., ECF No. 8.) The events giving rise to this action took place while Plaintiff was housed at Ely State Prison (ESP).

---

[1] Plaintiff filed a document titled a "motion to dismiss" where he asks that Defendants' motion for summary judgment be denied or that he be given more time to respond to Defendants' motion for summary judgment because he needs further discovery. (ECF No. 127.) The court has issued a separate order denying that motion.

(*Id.*) Defendants are Renee Baker, Mark Boyd, Rebecca Boyd, Harold "Mike" Byrne (erroneously named by Plaintiff as Byrnes), Dwayne Deal, Charles Dudley, Robert Dugan, Sheryl Foster, William Gittere, Curtis Kerner, James Lester, E.K. McDaniel (erroneously named by Plaintiff as McDaniels), William Moore, Dwight Neven, Tasheena Sandoval, (former Governor) Brian Sandoval, Scott Sisco, Donald Southworth, and Brian Williams.[2]

After screening Plaintiff's original and amended complaints, Plaintiff was permitted to proceed with claims in Counts I to VIII, X, XI, and XII, for retaliation, due process, access to courts, First Amendment claims concerning the receipt of books as well as mail, equal protection, Eighth Amendment conditions of confinement, failure to protect and deliberate indifference to serious medical needs concerning events that are alleged to have occurred while he was housed at ESP.[3] (ECF Nos. 3, 7, 15.) The allegations and defendants against whom each claim was allowed to proceed will be discussed in detail below.

Defendants now move for summary judgment as to each of Plaintiff's claims.

## II. LEGAL STANDARD

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome

---

[2] Defendants Fletcher and Hampton were dismissed without prejudice under Federal Rule of Civil Procedure 4(m) for lack of service. (ECF No. 70.)

[3] The court found Plaintiff failed to state any colorable claim in Count IX in both the original and amended complaint.

of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex*, 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson*, 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and determine the truth or to make credibility determinations. *Celotex*, 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations

omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

### III. DISCUSSION

**A. Plaintiff's Response**

There are several deficiencies in Plaintiff's response that arise with respect to almost every claim, that the court will reference in its analysis of Plaintiff's claims, and so discusses those deficiencies in advance here.

"42 U.S.C. § 1983 creates a cause of action against a person who, acting under color of state law, deprives another of rights guaranteed under the Constitution." *Jones v. Williams*, 297

F.3d 930, 934 (9th Cir. 2002). "In order for a person acting under color of state law to be liable under section 1983 there must be a showing of personal participation in the alleged rights deprivation[.]" *Id.* (citations omitted). When an official is sued under 42 U.S.C. § 1983, the inmate "must show that each defendant personally played a role in violating the Constitution." *Hines v. Yousef*, 914 F.3d 1218, 1228 (9th Cir. 2019), *cert. denied sub nom., Smith v. Schwarzenegger,* 140 S.Ct. 159 (2019) ("inmates must show that each defendant personally played a role in violating the constitution.").

With respect to each claim asserted, Plaintiff fails to show in response to Defendants' arguments and evidence the role each Defendant personally played in allegedly violating his Constitutional rights. Instead, he relies on broad generalizations without providing any specific discussion of what each Defendant did or pointing to specific evidence to demonstrate the role each Defendant played.

In addition, Plaintiff has attached hundreds of pages of exhibits to his motion, but in arguing Defendants are not entitled to summary judgment he fails to point the court to any specific exhibit. At times, he just references broad categories of exhibits, such as "property" exhibits, without advising the court which of the exhibits support his particular assertion. It is Plaintiff's burden to demonstrate each Defendant violated the Constitution and to raise a genuine dispute of material fact. It is not the court's responsibility to determine that there is a genuine dispute of material fact by culling through hundreds of pages of exhibits with no direction from the Plaintiff as to which exhibit supports his assertion of a disputed fact. *See* Fed. R. Civ. P. 56(c) (requiring a party asserting that a fact is genuine disputed to support that assertion by "citing to *particular* parts of materials in the record").

Finally, with respect to each claim, Plaintiff merely restates his conclusory allegations or makes vague statements that his rights were violated without supporting those allegations with facts supported by evidence.

Plaintiff cannot meet his burden of raising a genuine dispute of material fact by simply relying on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. He must go beyond assertions and allegations and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

Simply repeating the vague allegations of his pleadings, without providing any factual evidence to support it is insufficient to demonstrate a violation of his rights. *See Far Out Productions, Inc. v. Oskar*, 247 F.3d 986 (9th Cir. 2001) (affidavits that did not present any specific facts to support the claims were insufficient to preclude grant of summary judgment). "The burden on the nonmoving party is not a heavy one; the nonmoving party simply is required to show specific facts, as opposed to general allegations, that present a genuine issue worthy of trial." 10A Wright, et. al., *Federal Practice and Procedure* § 2727.2 (4th ed. 2008).

**B. Defendants' Res Judicata Argument**

Defendants note that summary judgment was granted in favor of the defense in another of Plaintiff's cases, *Antonetti v. State of Nevada, et. al.,* 3:17-cv-00606-MMD-CLB; however, other than citing the standard for *res judicata* and discussing the overlap between the claims in that case and this case in very broad terms, Defendants do not demonstrate how they meet the requirements to establish that claim preclusion is appropriate here. There may be a successful claim or issue preclusion argument to be asserted, but Defendants have not met their burden of demonstrating they are entitled to summary judgment on this basis.

**C. Count I**

    **1. Allegations**

    Plaintiff alleges that since January of 2015, he has been in ad-seg indeterminately, and was denied any meaningful review or classification. He asserts a due process claim in Count I against Moore, Dugan, Caseworker Sandoval, Fletcher, Baker, Byrne, Gittere, Deal, McDaniel, Foster and Southworth based on allegations that they placed him in ad-seg indeterminately without any meaningful review.

    Plaintiff also asserts a retaliation claim against Moore, Dugan, Caseworker Sandoval, Fletcher, Baker, Byrne, Gittere, Deal, McDaniel, Foster, and Southworth based on allegations that he has ongoing litigation against prison officials and was filing multiple grievances against prison officials when they placed him in ad-seg and denied him any meaningful review of his ad-seg status.

    **2. Facts Re: Segregation**

    Plaintiff's case notes reflect that on January 12, 2015, Plaintiff was given a memorandum regarding HRP (high risk potential) review. (ECF No. 122-1 at 14.) On January 23, 2015, he was seen for ad-seg review at his door. It was noted he was currently housed as HRP in ad-seg, and his HRP status was to be reviewed on February 4, 2015. (*Id.*) It was further noted that he was granted suspended disciplinary segregation and given HRP status for a staff assault at High Desert State Prison (HDSP), and had an escape history. He was to remain in ad-seg for 30 days. He was advised at that time that if he were removed from HRP status he could double cell. (*Id.*) An updated case note on February 10, 2015, indicates that Plaintiff was given a copy of the date of his HRP review hearing date change on February 6, 2015, noting the new hearing date of February 11, 2015. (ECF No. 122-1 at 14.)

Plaintiff was present for a full classification review of his HRP status on February 11, 2015. It was indicated that he had been placed on HRP status due to an extensive escape attempt history, and possession of escape tools. He was currently housed in ad-seg due to the recent suspension of his disciplinary segregation until August 2016. He had remained disciplinary free since being placed on HRP status. Plaintiff asked to be removed from HRP status, stating he had been programming and was compliant with mental health. The committee recommended he be removed from HRP status. (*Id*. at 15.)

Plaintiff had a monthly ad-seg review on February 24, 2015, but he refused to be seen at his door for the review. The notes state he was being held in ad-seg due to his refusal to double cell, though he indicated he was willing to double cell now. He was advised that his HRP status would prevent any change in custody, but this would be revisited if his HRP status was removed. (*Id*. at 15.) Plaintiff received notice indicating his formal removal from HRP status on March 6, 2015. (*Id*. at 15.)

Plaintiff was sent to HDSP for court in mid-March of 2015. (*Id*.) He had an ad-seg review upon his return to ESP, but he declined to be seen at his door. He was housed in ad-seg due to his recent HRP removal and an adjustment period. He would remain in ad-seg for 30 days. (*Id*. at 16.)

On May 22, 2015, Plaintiff declined to be seen at his door for his monthly ad-seg review. He was still housed in ad-seg due to his recent HRP removal and adjustment period. He was to remain in ad-seg with a review in 30 days. (*Id*.)

On May 28, 2015, there is a note that Plaintiff was being transferred to HDSP for a court appearance. (*Id*.)

1      Plaintiff was present for a due process hearing on June 8, 2015, at HDSP, and on June 18,

2 2015, there was an ad-seg review, indicating Plaintiff would remain in ad-seg pending

3 completion of court. (*Id*.)

4      He arrived back at ESP on June 24, 2015. He was housed in ad-seg. (*Id*.) Plaintiff refused

5 to be seen at his door for his monthly ad-seg review on July 21, 2015. He was still being housed

6 in ad-seg due to his previous HRP status. It was indicated Plaintiff was willing to double cell and

7 they would work with his caseworker to identify potential cellmates. He was to remain in ad-seg

8 with another review in 30 days. (*Id*.)

9      Plaintiff declined to be seen for his monthly ad-seg review on August 21, 2015.

10 September 23, 2015, October 22, 2015, December 1 and 22, 2015, and January 19, 2016. The

11 notes state that they would work with his caseworker to identify a potential cellmate. (*Id*. at 17-

12 18.)

13      On February 4, 2016, there is a note from the housing committee that Plaintiff and

14 another inmate indicated a desire to live together. The request was approved, and both were

15 advised they needed to remain disciplinary free. (*Id*. at 18.)

16      On February 22, 2017, Plaintiff was given notice that a classification committee HRP

17 review would take place on February 24, 2017. (*Id*. at 19.) He was seen for the full classification

18 review on February 28, 2017. It was noted Plaintiff was involved in an incident on February 21,

19 2017, with other inmates with weapons. Nevertheless, Plaintiff was not placed back on HRP

20 status. (*Id*.; *see also* Notice of Charges at ECF No. 122-7.) According to ESP Associate Warden

21 of Operations William Reubart, investigation and disciplinary proceedings related to a prison

22 altercation, and particularly those involving weapons, may necessitate assigning the inmate

23

involved to ad-seg to protect the integrity of the investigation and safety of the facility by separating the inmate from the rest of the population. (ECF No. 122-9.)

Plaintiff was present for an ad-seg due process hearing on March 2, 2017. He was moved to ad-seg as a result of the pending offense in custody regarding the incident with weapons discussed above. He was advised he would remain in ad-seg pending completion of the disciplinary process. (ECF No. 122-1 at 19.)

Plaintiff declined to appear for his ad-seg review on March 29, April 27 and May 24, 2017, April 27. He would remain in ad-seg pending completion of the disciplinary process. (*Id*. at 19-20.) Plaintiff did present for his ad-seg review on June 20, 2017. It was noted that the disciplinary charges were to be completed on June 23, 2017, and Plaintiff would remain in ad-seg pending their completion. It was also indicated that Plaintiff had previously been considered for out-of-state transfer, but he had court cases pending. Plaintiff advised he would submit documents to staff regarding the out-of-state transfer. (*Id*. at 20.) Plaintiff entered a plea of guilt to the charge of being in possession of an inmate-made weapon on June 23, 2017. (ECF No. 122-7 at 4.) He was sanctioned with 60 days in disciplinary segregation. (*Id*. at 6.)

Plaintiff declined to be seen for his ad-seg review on August 4 and September 7, 2017. It was noted he was placed in ad-seg after completing his disciplinary segregation sanction on July 26, 2017. There were security concerns due to his STG ad possible problems in "CLS-GP units." He would be reviewed in 30 days. (*Id*.)

Plaintiff left ESP on October 19, 2017, for HDSP pending his out of state transfer. (*Id*.)

**3. Due Process**

The Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To invoke its

protections, an inmate "must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Once the plaintiff has established one of these interests is at stake, the court's analysis turns to whether the inmate suffered a denial of adequate procedural protections. *See Biggs v. Terhune*, 334 F.3d 910, 913 (9th Cir. 2003) (citations omitted).

"A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty'[.]" *Wilkinson*, 545 U.S. at 221 (citing *Vitek v. Jones*, 445 U.S. 480, 493-94 (1980) (liberty interest in avoiding involuntary psychiatric treatment and transfer to mental institution); *Wolff v. McDonnell*, 418 U.S. 539, 556-58 (1974) (liberty interest in avoiding withdrawal of state-created system of good-time credits)). "[T]he Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement." *Id.* (citing *Meachum v. Fano*, 427 U.S. 215, 225 (1976)).

Courts have uniformly held that placement in ad-seg for non-punitive reasons does not give rise to a liberty interest from the Constitution itself. *See Chappell v. Mandeville*, 706 F.3d 1052, 1063 (9th Cir. 2013) (quoting *Hewitt v. Helms*, 459 U.S. 460, 468 (1983)). As the Supreme Court explained, ad-seg, which is "used to protect the prisoner's safety, to protect other inmates from a particular prisoner, to break up potentially disruptive groups of inmates, or simply to await later classification or transfer" "is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration." *Hewitt v. Helms*, 459 U.S. 460, 468 (1983).

"[A] liberty interest in avoiding particular conditions of confinement *may* arise from state policies or regulations, subject to the important limitations set forth in *Sandin v. Conner*, 515 U.S. 472 (1995)." *Wilkinson,* 545 U.S. at 222 (emphasis added). *Sandin* held that liberty interests created by the state are generally limited to "freedom from restraints which, while not exceeding

11

1  the sentence in such an unexpected manner as to give rise to protection by the Due Process

2  Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in

3  relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483-84.

4      Assuming the inmate demonstrates a protected liberty interest is implicated, the court will

5  then analyze whether the inmate received the process he was due. In the context of placement in

6  ad-seg for non-punitive reasons, the inmate must be given notice of the reason for the

7  segregation and be provided, within a reasonable time after such placement, with an informal,

8  non-adversary review of the evidence justifying the decision to segregate the inmate. *See Hewitt*,

9  459 U.S. at 476, *abrogated in part on other grounds in Sandin v. Connor*, 515 U.S. 472 (1995);

10  *Toussaint v. McCarthy*, 801 F.2d 1080, 1100 (9th Cir. 1986), *abrogated in part on other grounds*

11  *in Sandin v. Connor*, 515 U.S. 472 (1995).

12      Unlike a disciplinary proceeding, an inmate is not entitled to "detailed written notice of

13  charges, representation of counsel or counsel-substitute, an opportunity to present witnesses, or a

14  written decision describing the reasons for placing the prisoner in administrative segregation."

15  *Toussaint*, 801 F.2d at 1100-01.

16      After being placed in segregation, prison officials must periodically review the initial

17  placement. *See Hewitt*, 459 U.S. at 477 n. 9 (noting this does not necessarily require the

18  submission of any additional evidence or statements).

19      Plaintiff was kept in ad-seg first because of his HRP status, and then he remained there

20  during an adjustment period and while it was determined whether there was an inmate for him to

21  double cell with, and then again while he was pending disciplinary action and post-disciplinary

22  segregation. Defendants' evidence also reflects that Plaintiff received several full classification

23

hearings as well as roughly monthly classification reviews, and for most of those reviews he declined to appear.

While Plaintiff argues that his ad-seg review hearings were meaningless, Defendants argue that the NOTIS entries indicate he declined to appear at many of the reviews afforded to him. Nor does the Constitution, or case law interpreting it, require a full blown classification hearing for every review session, where Plaintiff is entitled to present his views and witnesses, as Plaintiff suggests.

Moreover, Plaintiff has not pointed the court to evidence to demonstrate the conduct each particular Defendant took to deny Plaintiff due process under the Fourteenth Amendment. He fails to discuss each time he contends a classification committee hearing or review was deficient, and what action each Defendant took to violate his rights in this regard.

For these reasons, summary judgment should be granted in Defendants' favor as to the due process claim in Count I.

### 4. Retaliation

"Section 1983 provides a cause of action for prison inmates whose constitutionally protected activity has resulted in retaliatory action by prison officials." *Jones v. Williams*, 791 F.3d 1023, 1035 (9th Cir. 2015); *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995). Such a claim consists of the following elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Jones*, 791 F.3d at 1035 (quoting *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

1    "The First Amendment guarantees a prisoner a right to seek redress of grievances from

2  prison authorities as well as a right of meaningful access to the courts." *Id.* (citing *Bradley v.*

3  *Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995)).

4        An inmate must submit evidence, either direct or circumstantial, to establish a link

5  between the exercise of constitutional rights and the alleged retaliatory action. *Pratt*, 65 F.3d at

6  806-07. "[A] plaintiff must show that his protected conduct was the 'substantial' or 'motivating'

7  factor behind the defendant's conduct." *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009)

8  (citation and quotation marks omitted). A plaintiff's mere speculation that there is a causal

9  connection is not enough to raise a genuine issue of material fact. *See Wood v. Yordy*, 753 F.3d

10  899, 904 (9th Cir. 2014) (citations omitted) (affirming grant of summary judgment where there

11  was no evidence that defendants knew about plaintiff's prior lawsuit, or that defendants'

12  disparaging remarks were made in reference to the prior lawsuit); *Nelson v. Pima Community*

13  *College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) (citation omitted) ("mere allegation and

14  speculation do not create a factual dispute for purposes of summary judgment").

15        Defendants argue that Plaintiff fails to establish sufficient personal participation of any

16  Defendant in the alleged retaliation, i.e., he does not identify any Defendant responsible for the

17  decision to place him in ad-seg and keep him there. In addition, Defendants argue that there is no

18  dispute that there were legitimate penological reasons for his ad-seg housing placement unrelated

19  to any protected conduct of Plaintiff. They further contend that Plaintiff fails to specify any prior

20  interaction that might give rise to retaliatory motive, or point to evidence they had personal

21  knowledge of his litigation efforts.

22        In response, Plaintiff argues that Baker admits that she was aware that Plaintiff had sued

23  Defendants in the past and was a litigator. He also states that Byrne and Sandoval were

14

defendants in his cases. He also contends that they had notice of his litigation activities because he took Defendants to trial, and it is undisputed he filed grievances which included the involvement of caseworkers, wardens and directors.

Defendants have produced evidence that Plaintiff was kept in ad-seg for legitimate reasons, and that he received many classification hearings and reviews of his ad-seg status, although he failed to appear for many of them.

Plaintiff's response does not assert how each Defendant named in this claim retaliated against him by keeping him in ad-seg without meaningful hearings or reviews.

In addition, Plaintiff must demonstrate his protected conduct (here, filing lawsuits and grievances) was the "substantial" or "motivating factor" behind Defendants' conduct. The only evidence Plaintiff points to is Baker's responses to his requests for admissions and the fact that he has sued many of these Defendants in other actions.

In discovery, Plaintiff asked Baker whether she was aware that Plaintiff had sued NDOC prior to this litigation, and that he filed multiple grievances at ESP. Baker admitted only that she was "currently" aware  (at the time of her discovery responses) that Plaintiff has sued NDOC in multiple lawsuits, and that Plaintiff had filed multiple grievances at ESP. (ECF No. 126 at 67-68, responses to requests 4, 5.)

This does not demonstrate that she was aware of the litigation or grievances at the time Plaintiff alleges she engaged in retaliatory conduct. Retaliatory motivation is not established simply by showing an adverse action by the defendant after the protected conduct. Instead, the plaintiff must show a nexus between the two. *Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000) (stating a retaliation claim cannot rest on "the logical fallacy of *post hac, ergo propter hac*, literally, 'after this, therefore because of this'"). This is exactly what Plaintiff attempts to do

15

here: argue that because he has filed many lawsuits and grievances, all adverse action taken against him is automatically retaliatory. This is insufficient to raise a genuine dispute of material fact as to retaliatory motive.

For these reasons, summary judgment should be granted in Defendants' favor on the retaliation claim in Count I.

**D. Count II**

**1. Retaliation**

Plaintiff asserts a retaliation claim against Sisco, McDaniel, Foster, Deal, Moore, Dugan, Caseworker Sandoval, Baker, Byrne, Fletcher, Gittere, and Kerner based on allegations that they knew Plaintiff had pending lawsuits against NDOC, and as a result they confiscated Plaintiff's legal materials.

Defendants argue there is no causal link between any affirmative act by Defendants and his protected activity.

Plaintiff again argues that Defendants knew he was litigating, and Baker admits to knowing, and grievances were filed against the named Defendants. Plaintiff further argues that despite knowing Plaintiff was permitted to have his six boxes of legal work, Kerner confiscated the boxes, and refused to send Plaintiff's legal work with him to court.

Defendant Kerner is the only defendant Plaintiff identifies in his response as having confiscated his legal work; however, even assuming this was true, Plaintiff provides no evidence to specifically connect Kerner's action with any protected activity. For the remainder of the Defendants, he does not mention what action they took to retaliate against him, or how and when they each knew of his litigation and grievance activity. To reiterate, it is insufficient for Plaintiff to claim generally that he was litigating and filing grievances. He must point the court to

evidence that each Defendant's action was the substantial motivating factor for his action. Plaintiff has not done so. Therefore, summary judgment should be granted in Defendants' favor as to the retaliation claim in Count II.

### 2. Access to Courts

Plaintiff asserts an access to courts claim against Sisco, McDaniel, Foster, Deal, Moore, Dugan, Caseworker Sandoval, Baker, Byrne, Fletcher, Gittere, Kerner, Williams, and former Governor Sandoval based on allegations they confiscated his legal materials and denied him forms, case law and assistance which resulted in dismissal of a section 1983 action, the inability to represent himself in his criminal appeal, and a time-bar in his habeas proceeding.

Inmates have a constitutional right of access to the courts. *See Bounds v. Smith*, 430 U.S. 817, 828 (1977), *limited in part on other grounds in Lewis v. Casey*, 518 U.S. 343, 354 (1996). An inmate alleging a violation of their right of access to the courts must show "actual injury," a requirement that "derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." *Lewis*, 518 U.S. at 349 (citations omitted). "It is for courts to remedy past or imminent official interference with individual inmate's presentation of claims to the courts; it is for the political branches of the State and Federal Government to manage prisons in such fashion that official interference with the presentation of claims will not occur." *Id. Lewis* held that *Bounds* did not establish a right to a law library or legal assistance, but a right of "*access to the courts.*" *Id.* at 350. The right "guarantees no particular methodology, but rather the conferral of a capability—the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts. …[It is this capability] rather than the capability of turning pages in a law library, that is the touchstone" of the right of access to the courts. *Lewis*, 518 U.S. at 356-57.

"[A]n inmate cannot establish relevant actual injury by simply establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Id*. at 351. Instead, the inmate must "demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Id*. The right of access to the courts does not guarantee an inmate the right to "*litigate effectively* ounce in court." *Id*. at 354 (emphasis original).

To establish actual injury, the inmate must demonstrate the loss of a "nonfrivolous" or "arguable" underlying claim, *Christopher v. Harbury*, 536 U.S. 403, 415 (2002), and the right of access to the courts is limited to non-frivolous direct criminal appeals, habeas corpus proceedings, and section 1983 actions. *See Lewis*, 518 U.S. at 353 n. 3, 354-55; *Simmons v. Sac. Cnty. Sup. Ct.*, 318 F.3d 1156, 1159-60 (9th Cir. 2003)

Defendants argue that Plaintiff cannot demonstrate actual injury for his access to courts claims because none of the underlying legal actions he discussed had merit. They contend that his writ of habeas corpus was denied in part and reversed in part, citing *Antonetti v. State of Nevada,* 403 P.3d 683 (Nev. 2017), 2017 WL 2633080, at *1. The denial of the writ was on the merits. His two post-conviction appeals were denied on the merits. Nor is there evidence that any of his section 1983 suits were dismissed because he was not able to properly amend. He filed a section 1983 complaint in case 3:11-cv-00548, and most claims were dismissed with prejudice because amendment would be futile, and one count was allowed to proceed. In April of 2014, Plaintiff had an amended 1983 complaint screened and several counts were dismissed for failure to state  a claim, with one count allowed to proceed in 2:13-cv-00064.

In addition, Defendants argue there is no evidence of any Defendant inhibiting his legal research, and Plaintiff has not demonstrated how his defeats are attributable to Defendants.

Plaintiff argues that he was being made to amend a complaint and wished to file state claims regarding property violations. He states that he did amend, but it "was apparently not good enough." He then needed to separate his claims into separate 1983 actions, and he did not have help with this. He states that his case was dismissed and he was unable to file another case, or separate cases. He claims that he has never been able to file state civil or tort claims for lack of research materials and assistance.

Plaintiff also states that he was unable to work on his habeas appeals on his criminal cases, and it was dismissed as time barred, referencing the years 2015-2017.

Plaintiff argues that he asked the law library staff for help, and was told they could not help him, and he was regularly denied research material.

To demonstrate "actual injury" it is not enough for Plaintiff to broadly state that he was denied access to the law library, and that he had cases dismissed. The only case he discusses specifically is a brief reference to case 3:14-cv-00495-JAD-VPC. There, Plaintiff filed his pro se, 260-page complaint on September 24, 2014, including 33 counts against 73 defendants. The court identified the deficiencies in the complaint, including that  it was organized in a confusing manner, Plaintiff did not identify the specific defendant engaged in the alleged conduct, did not include adequate allegations to support a claim, and included conclusory allegations. Plaintiff was granted leave to file an amended complaint to cure the deficiencies, and directed Plaintiff to organize the counts either by events or by claims, to follow the directions in the form complaint and avoid conclusory allegations and generalizations. (3:14-cv-00495-JAD-VPC, ECF No. 3.)

Plaintiff filed a proposed amended complaint, which the court screened. The amended complaint was 186 pages, and sued 86 defendants. The court dismissed the amended complaint with leave to amend because the problems identified in the first screening order had not been

addressed. The court reiterated that any further amendment must be short and plain, and that he may not raise multiple unrelated claims in a single lawsuit and it was insufficient that the defendants were mostly employees of NDOC and occurred while incarcerated. (3:14-cv-00495-JAD-VPC, ECF No. 15.) The case ended up being dismissed without prejudice because Plaintiff failed to timely file a second amended complaint. (3:14-cv-00495-JAD-VPC, ECF No. 21.) Plaintiff appealed, and the Ninth Circuit affirmed, finding that Plaintiff's first amended complaint did not comply with Federal Rules of Civil Procedure 8(a) and 20(a). (3:14-cv-00495-JAD-VPC, ECF No. 28.)

In this case, Plaintiff does not state anywhere in a pleading nor in his opposition how specifically he was denied his right to access the courts in this regard. Nor does he state or point the court to evidence regarding what each Defendant named in this claim did to deny him access to the courts in 3:14-cv-00495-JAD-VPC, or in any other case.

For these reasons, summary judgment should be granted in Defendants' favor as to the access to courts claim in Count II.

**E. Count III**

**1. Allegations**

Plaintiff asserts a retaliation claim against Boyd and Kerner based on allegations that Baker approved some of Plaintiff's hardcover books, but Boyd and Kerner refused to issue those books after plaintiff complained about Boyd and Kerner.

Plaintiff also asserts a First Amendment claim regarding receipt of the hardcover books against McDaniel, Foster, Deal, Sisco, Baker, Byrne, Fletcher, Gittere, Moore, Dugan, Williams and Southworth.

### 2. Facts Re: Hardcover Books

AR 750 allows only paperback books. (ECF No. 122-15 at 12.) In addition, the number of books in an inmate's possession must comply with AR 711, NDOC's inmate personal property regulation, and operating procedures. (*Id*. at 13.) All books that do not comply are sent to the publication review committee. (*Id*.) Under AR 711, inmates are allowed to possess 10 personal books, including legal and religious books. (ECF No. 122-16 at 13.) Between January and August of 2015, Plaintiff was approved to receive at least 18 books, and continued to receive approval for additional books in the following months. (ECF No. 122-17 at 2, 19,  20, 22; ECF No. 122-18 at 2, 7, 11, 14, 15, 17.) Plaintiff was granted a waiver for removal of the hardback cover for the religious book, "The British Edda" on August 20, 2015. (ECF No. 122-17 at 21; ECF No. 122-18 at 3.) Hardcover books were withheld from Plaintiff on August 13, 2015, when "John Quincy Adams" was rejected; on October 20, 2015, when an unidentified hardback book was rejected (ECF No. 122-18 at 5, 13); on January 23, 2016, when an unidentified hardback was rejected (ECF No. 126-1 at 31); and on February 19, 2016, when "James Madison" was rejected. (ECF No. 126-1 at 30);

Plaintiff filed a grievance on August 17, 2015, concerning his being denied the hard cover book. Robert Dugan responded that he needed to provide information regarding the book so it could be appropriately reviewed. In the first level grievance, Plaintiff stated he was not permitted the book "British Edda," or the biography of John Adams or any other hard cover books. In the first level response, Plaintiff was advised that the covers could be removed and be provided to him for his study. Plaintiff said that he kited for removal of the covers and was denied, but he would try again. (ECF No. 126-1 at 49.)

Plaintiff filed another grievance on this issue on January 11, 2016. Plaintiff was informed that under AR 750, books must be paperback only. Plaintiff complained that the policy was improper. (ECF NO. 126-1 at 50.)

**3. Retaliation**

Defendants argue that Plaintiff does not state what complaints he made against Boyd and Kerner, with whom they were lodged, and whether Kerner and Boyd knew about the complaints. They also argue there were legitimate reasons for rejecting the books, including that the regulations do not allow hardcover books, and Plaintiff had exceeded the number of books he could have in his possession.

In his response, Plaintiff states that he was suing and grieving. In his declaration, he states that he did not have issues getting books until he grieved. (ECF No. 126 at 49 ¶ 18.)

Once again, Plaintiff points to no evidence connecting Kerner and Boyd's action of allegedly denying Plaintiff hardcover books and his asserted protected activity. He does not indicate whether, how, or when Boyd and Kerner knew of his lawsuits and grievances.

In the absence of evidence of any causal connection, summary judgment should be granted in Defendants' favor as to the retaliation claim in Count III.

**4. First Amendment**

Defendants argue that they reasonably believed that enforcement of AR 740.08(2) was constitutional because the policy of banning possession of hardcover books had been upheld on grounds of safety and security in *Countryman v. Baca*, 465 Fed.Appx. 720 (9th Cir. 2012). They also assert that Plaintiff's documented history of smuggling prison shanks underscores the need for a hardcover book ban.

Plaintiff argues that he has a constitutional right to the hardback books he was denied. He repeats his allegation that Boyd and Kerner were told Plaintiff could have some of his hardcover books and still refused them.

"[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 28 U.S. 78, 88 (1987). There are several relevant factors in conducting this analysis. The first factor is whether there is a valid, rational connection between the regulation and the legitimate governmental interest put forward to justify it. *Id.*  In First Amendment cases, the Court has instructed that it is important to determine whether prison regulations "operate in a neutral fashion, without regard to the content of the expression." *Id.* at 89-90 (citations omitted).

The second factor is "whether there are alternative means of exercising the right that remain open to prison inmates." *Id.* at 90. "Where 'other avenues' remain available for the exercise of the asserted right, … courts should be particularly conscious of the measure of judicial deference owed to corrections officials … in gauging the validity of the regulation." *Id.* (citation and quotation marks omitted).

The third factor is "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* "In the necessarily closed environment of the correctional institution, few changes will have no ramifications on he liberty of others or on the use of the prison's limited resources for preserving institutional order." *Id.* "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Id.* (citation omitted).

1    The last factor to consider is "the absence of ready alternatives." *Id*. If there are no ready

2    alternatives, that "is evidence of the reasonableness of a prison regulation." *Id*. "[T]he existence

3    of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an

4    'exaggerated response' to prison concerns." *Id*. "[P]rison officials do not have to set up and shoot

5    down every conceivable alternative method of accommodating the claimant's constitutional

6    complaint." *Id*. at 90-91 (citation omitted). "But if an inmate claimant can point to an alternative

7    that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a

8    court may consider that as evidence that the regulation does not satisfy the reasonable

9    relationship standard." *Id*. at 91.

10    The Supreme Court has specifically recognized that "hardback books are especially

11    serviceable for smuggling contraband into an institution; money, drugs, and weapons easily may

12    be secreted in the bindings." *Bell v. Wolfish*, 441 U.S. 520, 551 (1979) (citation omitted). "They

13    are also difficult to search effectively." *Id*. Thus, there is a valid, rational connection between the

14    regulation and the legitimate governmental interest of safety and security put forward to justify

15    it.

16    In addition, the rule prohibiting hardback books operates in a neutral fashion, without

17    regard to the content of the expression.

18    Next, there are alternative means of obtaining reading material, i.e., ordering soft cover

19    books. Plaintiff does not address whether he tried ordering those books in soft cover.

20    The obvious impact accommodation of the asserted constitutional right will have on

21    guards and other inmates, and on the allocation of prison resources generally, as the Supreme

22    Court recognized in *Bell v. Wolfish,* is that additional time and resulting expense that would have

23    to be spent searching hardbound books for contraband.

The last factor is whether there are ready alternatives. Plaintiff does not raise any ready alternative to this policy.

In sum, the factors demonstrate that the regulation prohibiting hard back books is reasonably related to legitimate penological interests of safety and security.

The court notes that this analysis of AR 750 is consistent with that adopted by Magistrate Judge McQuaid (now recalled Magistrate Judge McQuaid) in the *Countryman* case, 3:07-cv-052-PMP (RAM), 2010 WL 1150318 (D. Nev. Feb. 11, 2010), adopted by Judge Pro at 2010 WL 11531234 (D. Nev. Mar. 19, 2010), and affirmed by the Ninth Circuit in an unpublished memorandum, 465 Fed.Appx. 720 (9th Cir. 2012).

Therefore, summary judgment should be granted in Defendants' favor on the First Amendment claim in Count III.

**F. Count IV**

Plaintiff asserts a retaliation claim against Kerner and Boyd based on allegations that after Plaintiff filed complaints against them they stopped delivering Plaintiff his mail.

Plaintiff is also proceeding with a First Amendment mail claim against McDaniel, Sisco, Foster, Deal, Baker, Byrne, Fletcher, Gittere, Kerner and Boyd based on allegations they refused to give Plaintiff his letters and photographs that were sent to him.

Defendants argue that Plaintiff's letters and photographs were appropriately delayed or intercepted by ESP mailroom staff for not complying with prison regulations, and not in retaliation. Plaintiff was advised in writing of having insufficient postage, not having his name or back number on his photographs as required by AR 740.03(5)(B)(c); not having a return address as required by AR 750.03(3)(D); and having more than the 10 enclosures per envelope under AR 750.03(5)(B)(1). (ECF No. 122-17 at 3, 4, 10, 12, ECF No. 122-18 at 8, 10, 16, 19, 23, 24, ECF

No. 122-15 (AR 750).) AR 750.02 provides that all envelopes must be properly addressed and have appropriate postage. (ECF No. 122-15 at 5.) Indigent inmates will be provided postage for two personal letters per week. (*Id*. at 6, AR 740.02.7.A.) AR 750.03.5.A allows up to ten enclosures per envelope, and a maximum of 10 personal photographs per envelope and all photographs must have the inmate's name and NDOC back number on the back. (*Id*. at 7.)

Defendants  assert that screening prisoner mail for security threats and ensuring postage is sufficient serves legitimate correctional purposes. Defendants also argue that Plaintiff does not demonstrate how the named Defendants knew of his litigation history or whether it prompted them to retaliate.

Plaintiff's response states that all Defendants knew he had sued NDOC, and that he was grieving mail and property regularly.

Plaintiff also argues that Defendants denied him many letters and photos. He contends that the policy states that excess photos will be sent back, but he claims that they were denying him the letters with them and all of the photographs, not just those in excess of the limit. Defendants said photos had to have a name and number on them, but they would refuse photos and letters that came in an envelope with the name and number.

First, as to the retaliation claim in Count IV, Plaintiff once again fails to point to any evidence connecting each named defendant to the alleged adverse action (i.e., evidence demonstrating when, where and how these Defendants denied him these items), and also has not demonstrated a causal connection between the alleged adverse action and the asserted protected conduct of litigation and grievances. As has been the case with all of the retaliation claims analyzed thus far, Plaintiff merely states that all Defendants knew he was litigating against

NDOC and filing grievances. This is insufficient. Therefore, summary judgment should be granted in Defendants' favor as to the retaliation claim in Count IV.

Next, as to the First Amendment claim, Defendants have provided evidence that Plaintiff's mail was only denied when it did not comply with NDOC regulations concerning the number of enclosures and photographs an inmate may possess, that personal photographs must be identified correctional, that mail must be addressed correctly and contain sufficient postage. They also argue that Plaintiff has not demonstrated the personal participation of each Defendant in the alleged constitutional violation.

Other than asserting generally that his mail was improperly taken, Plaintiff points to no evidence to support his claim. Moreover, he has not argued, let alone established with evidence, the conduct each Defendant named in this claim took to allegedly violate his constitutional rights. In the absence of evidence of personal participation of each of the Defendants, summary judgment should be granted in their favor as to the First Amendment mail claim in Count IV.

**G. Count V**

Plaintiff asserts a retaliation claim against Boyd, Lester, Baker, Byrne, McDaniel, Foster, Kerner, Deal, Sisco, Fletcher, Williams and Caseworker Sandoval based on allegations they deprived Plaintiff of items including literature, mail, books, religious artifacts, and religious and political literature because of his grievances.

Plaintiff also alleges a First Amendment claim against Mark Boyd, Lester, Baker, Byrne, McDaniel, Foster, Kerner, Deal, Sisco, Fletcher, Williams, and Caseworker Sandoval based on allegations they interfered with his receipt of correspondence and publications.

Finally, Plaintiff is proceeding with an equal protection claim against Boyd, Lester, Baker, Byrne, McDaniel, Foster, Kerner, Deal, Sisco, Fletcher, Williams and Caseworker

Sandoval based on allegations they denied Plaintiff materials they considered hateful because they do not like Plaintiff's religious views, but permitted inmates of other religions to have hateful materials.

Defendants present evidence that AR 750.01(O)(2)(j) prohibits "content that advocates terrorism, racial, religious, or national origin hatred, or that creates an unsafe environment for offenders or prison staff." (ECF No. 122-15 at 5.) Plaintiff had three books shipped to him on November 6, 2015, titled "Knights of the Klu Klux Klan," "Behind Communism," and "A place of Safety" from Karl Hand Bookseller. The books were denied for containing hate speech. (ECF No. 122-18 at 18.) Plaintiff did, however, have many other books of various subject matters delivered to him. (ECF No. 122-17, 122-18.)

Plaintiff also had photographs shipped to him from Soiled Doves in Fernley, Nevada, that were confiscated because they depicted bondage. (ECF No. 122-18 at 10.) Defendants present the Webster's online dictionary definition of "Soiled Dove" as being euphemism for prostitute. (ECF No. 122-19.)

Plaintiff's response states that Defendants knew by settlements, trial, ongoing litigation and memos and classifications of his litigation and the record is full of grievances about property and mail.

Like his other retaliation claims, Plaintiff neither alleges nor points to specific evidence to demonstrate a factual connection between each Defendant and the alleged adverse action. Nor does he specifically connect the alleged adverse action with his litigation and grievance activity. It is insufficient to generally state that Plaintiff was litigating and filing grievances. In addition, he has provided no evidence in response to that presented by Defendants that there were

legitimate reasons for withholding his publications and photographs. For these reasons, summary judgment should be granted in Defendants' favor as to the retaliation claim in Count V.

With respect to the First Amendment claim, Plaintiff likewise failed to produce evidence in response to Defendants' evidence that Plaintiff's items were confiscated for legitimate penological reasons. Nor does Plaintiff connect each named Defendant to the alleged unconstitutional conduct. Therefore, summary judgment should be granted in Defendants' favor as to the First Amendment claim in Count V.

Finally, with respect to the equal protection claim, Plaintiff's response only states that he witnessed other persons obtaining materials within the same prison. This vague statement is insufficient to create a genuine dispute of material fact in response to Defendants' argument and evidence that the items were taken from Plaintiff for legitimate penological reasons and there is no evidence he was treated differently than similarly situated inmates. Therefore, summary judgment should be granted in Defendants' favor as to the equal protection claim in Count V. *See Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013) (citation omitted); *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) ("class of one" equal protection claim must demonstrate plaintiff was intentionally treated differently from others who are similarly situated with no rational basis).

**H. Count VI**

Plaintiff asserts an Eighth Amendment conditions of confinement claim against McDaniel, Foster, Deal, Sisco, Baker, Byrne, Fletcher, Gittere and Hampton based on allegations that Defendants did not give him adequate cleaning supplies to clean his cell; he had to use his bare hands to clean toilets; and, inmates have to share trimmers without sanitizing in between uses.

The Eighth Amendment prohibits the imposition of cruel and unusual punishment. U.S. Const. amend VIII. Although conditions of confinement may be restrictive and harsh, they may not deprive inmates of "the minimal civilized measures of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Prison officials must provide prisoners with "food, clothing, shelter, sanitation, medical care, and personal safety." *Toussaint v. McCarthy*, 801 F.2d 1080, 1107 (9th Cir. 1986), *abrogated in part on other grounds by Sandin v. Connor*, 515 U.S. 472 (1995); *see also Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000). "The circumstances, nature, and duration of a deprivation of [ ] necessities must be considered in determining whether a constitutional violation has occurred." *Johnson*, 217 F.3d at 731. "The more basic the need, the shorter time it can be withheld." *Hoptowit v. Ray*, 682 F.2d 1287, 1259 (9th Cir. 1982).

Where a prisoner alleges injuries stemming from unsafe conditions of confinement, prison officials may be held liable only if they acted with "deliberate indifference to a substantial risk of serious harm." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998). The deliberate indifference standard has objective and subjective components. First, the alleged deprivation must be, in objective terms, "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citation omitted). Second, the prison official must "know of and disregard an excessive risk to inmate health or safety." *Id*. at 837.

According to Defendants, under ESP's OP 726, inmates may obtain cleaning supplies from staff, including powdered cleanser and disinfectant. (ECF No. 122-22 at 5-6.) ESP's OP 507 states that ad-seg inmates have access to cell cleaning supplies (limited to one ounce of powdered cleanser at a time) and tools (limited to a short cleaning brush, whisk broom and plastic dust-pan) which may be issued upon request, as needed. (ECF No. 122-4 at 11.)

State-issued personal hygiene supplies (including toilet paper, toothpaste, toothbrush, and bar soap) are distributed by unit staff on Sundays and Thursdays to inmates at their cells. (*Id*.; ECF No. 122-23 at 3-4; ECF No. 122-4 at 10.) Razors may also be issued on inmate supply issue days or as security dictates. (ECF No. 122-23 at 4.) Personal hygiene needs may be temporarily denied for safety or security reasons. (*Id*.) AR 711 expressly prohibits transferring or loaning of property (including razors) between inmates. (ECF No. 122-24 at 6.)

Defendants state that to the extent Plaintiff experienced delays in obtaining cleaning supplies, it was in accordance with policy for legitimate penological reasons. In addition, they assert that his history of violating prison safety regulations, including his use of prison shanks, would have created a reasonable basis for withholding razors.

Defendants further argue that Plaintiff's claim that Defendants only allowed him two showers per week is untrue. AR 705 provides that inmates will be given adequate time and facilities to shower or bathe at least three times a week. (ECF No. 122-23 at 4.) ESP OP 507 governs ad-seg at ESP, and also provides that under normal circumstances inmates in ad-seg will be afforded a shower at least three times per week. (ECF No. 122-4 at 22.)

In his response, Plaintiff states that he and other inmates were not given sufficient cleaning supplies; he repeats that inmates are made to share trimmers which is unhygienic; and having to use bare hands to scrub toilets is dangerous and can spread disease.

Defendants provide evidence that prison policies offer Plaintiff the ability to obtain adequate cleaning supplies, prohibit the sharing of razors/trimmers between inmates, and allow inmates to shower at least three times a week (absent specific security or safety issues that may result in a temporary denial of those things).

In response, Plaintiff merely re-states his broad allegations that cleaning supplies were insufficient and he was meant to share trimmers. He provides no facts and points to no specific evidence concerning when this occurred, how often it occurred, or what conduct was taken by each Defendant named in this claim to allegedly violate his rights. Insofar as his pleading can be construed as asserting a claim based on the lack of showers, he fails to address Defendants' evidence that inmates are offered the opportunity to shower three times a week.

In sum, Plaintiff has not raised a genuine dispute of material fact as to whether his rights were violated under the Eighth Amendment in terms of these conditions of confinement. Therefore, summary judgment should be granted in Defendants' favor as to the Eighth Amendment claim in Count VI.

## I. Count VII

Plaintiff asserts a due process claim against Rebecca Boyd, Mark Boyd, Kerner, Baker, Byrne, Fletcher, McDaniel, Deal, Sisco, Foster, Williams, Southworth, Moore, Gittere, Neven, Dudley, and Lester based on allegations that they took his property pursuant to state procedures and regulations.

Plaintiff also asserts a retaliation claim against Rebecca Boyd, Mark Boyd, Kerner, Baker, Byrne, Fletcher, McDaniel, Deal, Sisco, Foster, Williams, Southworth, Moore, Gittere, Neven, Dudley, and Lester based on allegations that they took his property in retaliation for grievances and litigation.

Defendants argue that Plaintiff alleges that Defendants undertook a large variety of authorized property seizures. They contend that the State of Nevada provides a meaningful post-deprivation remedy for such losses under Nevada Revised Statute (NRS) 41.0322. Plaintiff could

1  have brought a small claims action to recover any personal property he believed was seized

2  improperly.

3          In addition, they argue that whenever property was seized from Plaintiff, it was done

4  during an authorized cell search or in the regular course of performing duties; however, Plaintiff

5  alleges that some property was lost or destroyed after being taken, or that it was inappropriately

6  taken without being recorded, which would be unauthorized activity. He attempts to invoke

7  liability for an intentional, but unauthorized deprivation, and his redress is a small claims action.

8          In any event, they contend that every property transfer and seizure was authorized,

9  documented and the property was appropriately placed or disposed of. (ECF Nos. 122-17, 122-

10 18.)

11         Regarding his property, Plaintiff states that he has been battling over these property

12 issues for years, it has cost him thousands of dollars, and he could not pursue a state remedy

13 because of the law library assistant. He says there are grievances where he documented

14 repeatedly that Defendants told him he was being retaliated against. He claims that he was not

15 permitted to mail out improperly confiscated items so he had no post-deprivation remedy, and

16 was given no pre-deprivation remedy.

17         Plaintiff merely repeats the generalized allegations made in his complaint concerning his

18 property. He does not point to a specific instance of property being taken without due process.

19 Nor does he connect any particular instance with the conduct of a specific Defendant.  He has not

20 raised a genuine dispute of material fact in response to Defendants' argument and evidence that

21 Plaintiff received due process when items were seized pursuant to NDOC procedures, and that a

22 viable state post-deprivation  remedy existed where the deprivation is alleged to have been an

23 unauthorized intentional deprivation. While he states that he was deprived of a state remedy

1  because of a law library assistant, he does not provide any specific factual information or point to

2  any evidence to support this claim. Therefore, summary judgment should be granted in

3  Defendants' favor as to the due process claim in Count VII.

4        Plaintiff has also provided no evidence to raise a genuine dispute of material fact in

5  response to Defendants' argument and evidence that the deprivations were conducted properly

6  pursuant to NDOC procedures and he received due process, or that he had an adequate post-

7  deprivation remedy and so the seizures were not retaliatory. Again, he does not causally connect

8  his litigation and grievance activities with each Defendant named in this claim. Therefore,

9  summary judgment should be granted in Defendants' favor as to the retaliation claim in Count

10  VII.

11  **J. Count VIII**

12        Plaintiff  asserts a due process claim in Count VIII against McDaniel, Foster, Deal, Sisco,

13  Baker, Byrne, Fletcher, Gittere, Southworth and Moore based on allegations that they

14  reclassified him as STG to keep him in ad-seg but did not notify him or provide him with a

15  hearing.

16        Defendants argue that Plaintiff's STG classification did not change during the time in

17  question. They state that Plaintiff was validated as a Skinhead gang member (white supremacist)

18  in November of 2004. (ECF No. 122-1 at 5.) They argue that his original classification is well

19  beyond the statute of limitations and is not at issue here. His case notes indicate he was classified

20  as a Skinhead through 2015. (*Id.* at 5-18.) The December 8, 2015 case note indicates his STG

21  classification was "WSA" which stands for White Supremacist Aryan and is synonymous with

22  skinhead. (*Id.* at 18.)  On August 12, 2016 and February 9, 2017, his case notes against list his

23

1  STG as Skinhead. (*Id.* at 19.) There is nothing that indicates that the STG classification was ever

2  removed.

3        Plaintiff states that he is a Christian Israelite with nationalistic views, and that does not

4  make him a gang member. He claims that STG is applied arbitrarily without a hearing. In

5  addition, he claims that AR 446 states that STG will be reviewed every six months, but that has

6  never been done. He says he was "STGed" in 2004, but the hearing did not occur until 2007, and

7  he never had any other hearing on STG. He claims to have written letters, kites and grievances

8  and had verbal discussions with all named Defendants on all issues, and they refused to remedy

9  the situation.

10       The Ninth Circuit has held that when an inmate is validated as STG, "due process

11 require[s] prison officials to give [the inmate] an opportunity to present his views to the 'critical

12 decisionmaker.'" *Castro v. Terhune*, 712 F.3d 1304, 1308 (9th Cir. 2013) (citing its prior reversal

13 and remand in that case, *Castro v. Terhune*, 29 Fed.Appx. 463, 466 (9th Cir. 2002) (*Castro I*)).

14 In *Castro I,* the Ninth Circuit held that the inmate may not "be entitled to a formal judicial

15 hearing or the full range of due process protections, [but] due process does require some notice

16 of the charges against him and a meaningful opportunity to present his views to the critical

17 decisionmakers." *Castro I,* 29 Fed.Appx. at 466  (citing *Mathews v. Eldridge,* 424 U.S. 319, 333

18 (1976); *Madrid*, 889 F.Supp. at 1277); *see also Bruce v. Ylst*, 351 F.3d 1283, 1287 (9th Cir.

19 2003) (inmate is entitled to "some notice of the charges against him and an opportunity to

20 present his views to the prison official charged with deciding whether to transfer him to

21 administrative segregation")).

22       Defendants are correct that any claim about his initial STG placement in 2007 is barred

23 by the statute of limitations. Section 1983 does not contain its own statute of limitations;

therefore, federal courts borrow the statute of limitations for section 1983 claims applicable to personal injury claims in the forum state. *See Wilson v. Garcia*, 471 U.S. 261, 279-80 (1985); *Pouncil v. Tilton*, 704 F.3d 568, 573 (9th Cir. 2012). In Nevada, the statute of limitations for personal injury claims, and therefore section 1983 actions brought here, is two years. Nev. Rev. Stat. 11.190(4)(e); *see also Perez v. Seevers*, 869 F.2d 425, 426 (9th Cir. 1989).

"A statute of limitations begins to run on the date on which the plaintiff's claim 'accrues.'" *Pouncil*, 704 F.3d at 573 (citation omitted). "Federal law determines when a cause of action for a Section 1983 claim accrues and, hence, when the statute of limitations begins to run." *Id.* (citation omitted). Under federal law, a claim accrues "when the plaintiff knows or has reason to know of the injury that is the basis of the action." *Id*. at 574 (citation omitted).

Plaintiff acknowledges that he knew the STG designation occurred in 2004, but he did not have a hearing until 2007. Even taking into account tolling during the exhaustion process, that would have occurred long before Plaintiff filed this action under AR 740.

Therefore, the court must address Plaintiff's claim only to the extent he is asserting that he did not receive review of his STG status during the time period asserted in his complaint that is within the statute of limitations.

A post-deprivation review (the classification review decision made after each of the STG designations) is not required to "independently reexamine the basis of the validation decision in order to satisfy due process, *if the prisoner had a previous opportunity to present his views on the correctness of the validation.*" *Castro I*, 29 Fed.Appx. at 465 (emphasis added) (citing *Madrid*, 889 F.Supp. at 1278).

It is unclear whether each classification review Plaintiff had, and there are many, was also reviewing his STG status. In any event, liability must be demonstrated with respect to each

defendant, and Plaintiff has made no effort to identify the role each Defendant named in this claim allegedly took to violate this rights in this regard. For this reason, summary judgment should be granted in Defendants' favor as to the STG due process claim in Count VIII.

**K. Count X**

Plaintiff asserts an Eighth Amendment conditions of confinement claim against McDaniel, Foster, Deal, Sisco, Williams, Baker, Byrne, Fletcher, Gittere and Southworth based on allegations that they were not serving Plaintiff enough food to adequately maintain his health, resulting in his BMI being at the bottom of the BMI scale, loss of weight and other health issues.

Defendants acknowledge that on January 12, 2016, a request for a double portion diet was submitted by Plaintiff's physician, but expressly said it was in place for a period of one year. (ECF No. 122-26 at 2.)

Defendants argue that Plaintiff has no evidence to support his claim he was deprived of a healthy, nutritious meals with adequate calories. Nor does he cite any authority that entitles him to three hot meals per day. In July of 2018, his height and weight were taken upon his return from a court appearance, and he was six feet tall and weighed 146 pounds and was not on a special diet. (ECF No. 122-27 at 2.) They contend this is within healthy BMI parameters for his height. (ECF NO. 122-28 at 2.) They also point out that Plaintiff received his usual prison diet, and was also provided with additional "Boost" dietary supplements beginning in September 2017. (ECF No. 122-29 at 2.) Finally, they argue that Plaintiff has not demonstrated any culpable action or inaction directly attributable to any Defendant.

Plaintiff argues that inmates are entitled to three hot meals a day. Instead, inmates get two meals and a wet sack lunch, and the two meals that should be hot are not hot. Plaintiff says he was not given the serving sizes claimed, and the menu only provides about half of the 2000

calories required per day. Plaintiff goes on to assert that the food is unhealthy and high in sodium and empty calories. He claims that his medical file is full of doctor's orders for additional food and also references a dangerously low BMI. He states that he is 6 feet tall and weighed between 126 to 136 pounds. In his declaration, he only states that the food at ESP was cold, he did not receive proper servings, and he received inadequate junk food that caused health issues. (ECF No. 126 at 48 ¶ 12.) The only other evidence related to this issue is a grievance where Plaintiff complained he was not given three hot, nutritious meals a day. (ECF No. 126-1 at 70.)

Under the Eighth Amendment, food does not need to be tasty or aesthetically pleasing, but it does need to be adequate to maintain health. *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993) (citation omitted).

To survive summary judgment, Plaintiff must raise a genuine dispute of material fact as to whether these Defendants were deliberately indifferent: that they knew of and disregarded a serious risk to his health in serving him his meals. First, Plaintiff does not identify what action or inaction he attributes to each of the Defendants named in this claim that he asserts violated his rights under the Eighth Amendment with respect to his meals. Nor does his response or declaration provide any specific facts regarding his meals. He states generally that he was denied hot, nutritious meals, but does not indicate when this occurred, what he was served and how exactly it was nutritionally insufficient.

Defendants provide evidence that Plaintiff was placed on a double portion diet for a year. Plaintiff does not address, let alone provide evidence to dispute that he received double portions for that year. Nor does he address whether he requested that his medical provider extend the diet, or state that he took any other action to advise the Defendants named in this claim that he felt his portions were insufficient or nutritionally inadequate. Defendants provide a record of Plaintiff's

weight at one point that put his BMI in the health range. Plaintiff counters in his response that he weighed less than that, but this statement was not in his declaration and he provides no evidence in the form of medical or other records that would indicate his weight on a particular date.

Finally, Plaintiff provides no facts to support his claim that he is entitled to three hot meals a day, or whether, when and how he raised this to each named Defendant and how they responded.

In sum, Plaintiff cannot meet his burden of raising a genuine dispute of material fact by simply relying on conclusory allegations that are unsupported by factual data. Instead, he must go beyond assertions and allegations and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial.

Simply repeating the allegation that he was not served three hot, nutritious meals, without providing any factual evidence as to when or how often this occurred, or which Defendant violated his rights and how, is insufficient to demonstrate a that his rights were violated.

For these reasons, summary judgment should be granted in Defendants' favor as to the Eighth Amendment claim in Count X.

**L. Count XI**

Plaintiff asserts a due process claim against McDaniel, Foster, Deal and Sisco based on allegations that prison officials are keeping his finances in a savings account without paying him interest, and they have refused to give him access to his account for supplies or court fees, and have withheld monetary gifts from his family.

NRS 209.247 allows the Director to make certain deductions from any money deposited in the individual account of an offender from any source other than the inmate's wages, including "[a]n amount determined by the Director for deposit in a savings account for the offender, in

1  which interest on the money deposited does not accrue, to be used for the payment of the

2  expenses of the offender related to his or her release or, if the offender dies before his release, to

3  defray expenses related to arrangements for the offender's funeral." NRS 209.247(5).

4      NRS 209.246 also requires the Director to establish regulations setting forth the criteria

5  for a reasonable deduction of money credited to the inmate's account to repay costs of providing

6  for a funeral of the inmate and providing the inmate with clothing, transportation and money

7  upon his release. NRS 209.246(1)(e), (f).

8      Defendants submit AR 258, with an effective date of May 15, 2018, which states that the

9  purpose of inmate savings accounts is to ensure inmates have funds upon their release or funds to

10  offset funeral costs if they die in custody. (ECF No. 122-30 at 4.) It provides that the director, or

11  his/her designee, may designate a percentage to be deducted from funds received by an inmate to

12  be placed in the inmate's individual savings account. (*Id*.) Once a $400 balance is reached and

13  maintained, a deduction will no longer occur for the savings account. (*Id*.) Withdrawals from a

14  savings account are permitted during incarceration only with the approval of the director or the

15  designee on a specified form. (*Id.*) Funds remaining in the savings account are paid to the inmate

16  upon release after all debts owed to NDOC are pain in accordance with NRS 209.2475. (*Id*.)

17      Plaintiff argues that the money in his savings account was "completely taken by

18  Defendants" and it never accrued any interest, and he was denied access to these funds. He

19  asserts that the amount required in the savings account was changed from $200 to $400.

20      The only evidence Plaintiff supplies in support of his claim is a White Pine County

21  Justice Court document showing a sum of $0.10 in his account at ESP and $214 in securities to

22  his credit (although he does not state what relevance this has to his claim though perhaps the

23  $214 is the savings account balance, but the court cannot ascertain this from Plaintiff's filings),

and a grievance where he complained of the increase of the savings account limit from $200 to $400. (ECF Nos. 126 at 51-52, 55.)

The Due Process Clause of the Fourteenth Amendment guarantees due process of law when government actors deprive a person of their property. U.S. Const. amend XIV. Inmates have a constitutionally protected property interest in their inmate accounts. *Hansen v. May*, 520 F.2d 728, 730 (9th Cir. 1974). The protection, however, is not absolute. "[T]he Due Process Clause protects inmates from unauthorized [account] deductions." *Vance v. Barrett*, 345 F.3d 1083, 1091 (9th Cir. 2003). "An agency, such as the NDOC, violates the Due Process Clause of the Fourteenth Amendment when it prescribes and enforces forfeitures or property '[w]ithout underlying [statutory] authority and competent procedural protections." *Nevada Dep't of Corr. v. Greene*, 648 F.3d 1014, 1019 (9th Cir. 2011) (quoting *Vance*, 345 F.3d at 1090).

Nevada law states that the NDOC director may deduct from an inmate's account "*[a]n amount determined by the Director* for deposit in a savings account for the offender" to pay for expenses upon release or for funeral expenses if the offender dies in custody. NRS 209.247(5) (emphasis added). Both NRS 209.246 and 209.247 authorize the NDOC director to determine the amount to be deducted for these expenses, and for the director may deduct money and place it in the savings account for such expenses.

In evaluating a similar claim made by another inmate, Magistrate Judge Carla Baldwin Carry accurately pointed out that the constitutional violation is the alleged failure to provide due process, and not the loss itself. *Beraha v. Nevada*, 3:17-cv-00366-RCJ-CLB, 2020 WL 3949223, at *5 (D. Nev. Apr. 27, 2020), *report and recommendation adopted in* 2020 WL 3928929 (D. Nev. July 9, 2020). Judge Baldwin concluded that the process outlined in AR 258—an inmate's ability to make withdrawals from the savings account with the approval of the director—as well

41

as the ability to utilize AR 740's grievance procedures, provide adequate procedural protections to the inmates insofar as the inmate savings accounts are concerned. *Id*. at *6.

The court agrees with Judge Baldwin's analysis, and finds that Plaintiff was provided with adequate procedural protections with respect to money being deducted from his account and placed in his savings account.

Insofar as Plaintiff argues that he was not provided interest on the money placed in the account, NRS 209.247(5) specifically provides that interest on the money deposited in the savings account does not accrue.

Finally, while the role of the Director with respect to the savings accounts is established by statute, Plaintiff does not identify what action each of the other named Defendants to this claim took to violate his rights.

Therefore, summary judgment should be granted in Defendants' favor as to the due process claim in Count XI.

**M . Count XII**

**1. Eighth Amendment Medical Needs**

Plaintiff asserts an Eighth amendment deliberate indifference to serious medical needs claim against Foster, Deal, Sisco, Williams, Baker, Byrne, Gittere based on allegations that the use of wrist and ankle restraints caused the ankle shackles.

A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A claim for deliberate indifference involves the examination of two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992),

1    *rev'd on other grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997); *see also*

2    *Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091,

3    1096 (9th Cir. 2006)). "A 'serious' medical need exists if the failure to treat a prisoner's condition

4    could result in further significant injury or the 'unnecessary and wanton infliction of pain.'"

5    *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104);  *see also Akhtar*, 698 F.3d at 1213.

6         If the medical need is "serious," the plaintiff must show that the defendant acted with

7    deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (citation

8    omitted). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051,

9    1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or

10   even gross negligence. *Id*. Inadvertence, by itself, is insufficient to establish a cause of action

11   under section 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present

12   when a prison official "knows of and disregards an excessive risk to inmate health or safety; the

13   official must both be aware of the facts from which the inference could be drawn that a

14   substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*,

15   511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (citation omitted).

16        Deliberate indifference exists when a prison official "den[ies], delay[s] or intentionally

17   interfere[s] with medical treatment, or it may be shown by the way in which prison officials

18   provide medical care." *Crowley v. Bannister*, 734 F.3d 967, 978 (9th Cir. 2013) (internal

19   quotation marks and citation omitted).

20        Defendants state that Plaintiff was sometimes placed in cuff restraints due to his STG

21   designation, his HRP status that resulted from a long history of violence and escape attempts,

22   and because he was housed in ad-seg. Inmates in ad-seg are placed in handcuffs and leg

23   restraints when moving from their cells to the showers, from cells to the yard, and when moved

outside the unit. (ECF No. 122-4 at 14-18 (ESP OP 507);  ECF No. 122-31 (AR 407).) The criteria for determining the degree and duration of restraint devices includes custody classification, violence potential determined by criminal history and disciplinary record, escape potential or past or present threat of escape, the nature and purpose of the movement, the circumstances at the time and the existence of potential threats by outside forces. (ECF No. 122-31 at 3, AR 407.01.2.)

Defendants assert that Plaintiff was appropriately restrained in accordance with AR 407 and ESP OP 507. The "big boy cuffs," that Plaintiff refers to, are necessitated when there is a large inmate whose ankles exceed the capacity of ordinary ankle cuffs. (ECF No. 122-31 at 4, AR 407.02.2.B.) Plaintiff's amended complaint alleges that he is six feet tall and 140 pounds (ECF No. 8 at 44), and therefore "big boy cuffs" would not have been appropriate for him.

Regarding the deliberate indifference claim, Defendants argue that Plaintiff alleges he was injured due to the cuffs on his ankles for an unspecified time between 2016 and 2017, but relies on a medical record from July 2008. The nurse made an entry at that time that he requested "big boy cuffs" because of leg pain and cutting into his skin causing him to bleed." (ECF No. 8 at 52.) They argue he provides no evidence of a serious medical need in 2016 to 2017. He does not demonstrate how normal size leg restraints exacerbate an injured knee in a way that larger restraints would not. His medical records show that he refused to undergo a physical examination on February 29, 2016. (ECF No. 122-33.)

In his response, Plaintiff states that every time shackles were put on him they cut him, and it was hundreds of times. He claims his injuries continued to get worse and he has nerve damage and scars. He states in his declaration that Defendants injured him with shackles and took no action. (Pl. Decl., ECF No. 126 at 47 ¶ 7.)  He wrote an informal level grievance on

44

March 17, 2015, stating he was made to walk around in shackles until it cut his ankles. (ECF No. 126-1 at 74.) He sent a kite on April 12, 2017, asking to get a "big guy" restraint order, noting he had pain and scars. He was advised this was determined by custody. (ECF No. 126-1 at 73.) He sent a kite on May 29, 2017, stating that he wrote to medical about bit cuffs because he claimed to have nerve damage in his foot/ankle from gouges in his ankles from the shackles. He was told to kite custody staff. (ECF No. 126-1 at 72.)

Defendants provide evidence that Plaintiff was shackled in accordance with NDOC and ESP policies, and point out that the medical record he relies upon to support his claim is from 2008 and does not establish deliberate indifference in the 2015 and onward period. Plaintiff's response merely reasserts his general allegations that the leg restraints caused him injuries. He provides no specific factual details about these injuries. Nor does he point to any medical records documenting his alleged injuries. Finally, as with the remainder of his claims, he does not connect any Defendant named in this claim to the alleged constitutional violation. In other words, he does not show that each Defendant named in this claim knew of his alleged injury from the shackles, and failed to respond to his medical complaints. For these reasons, summary judgment should be granted in Defendants' favor as to the Eighth Amendment deliberate indifference to serious medical needs claim in Count XII.

**2. Eighth Amendment Failure to Protect**

Plaintiff asserts an Eighth Amendment failure to protect claim against McDaniel, Neven, Foster, Sisco, Deal, B. Williams, Baker, Byrne, Fletcher, Gittere, Caseworker Sandoval, Moore, and Southworth based on allegations that they placed his safety at risk because he is restrained while other inmates around him are not and have the ability to harm him.

Defendants point to a Pennsylvania District Court case, *Kelly v. Miller*, 639 F.Supp. 56, 58 (M.D. Pa. 1985), where the court found that since the plaintiff had never actually been assaulted he had not demonstrated an Eighth Amendment claim. They argue that Plaintiff similarly fails to allege he was ever attacked by an unshackled inmate while he was in restraints, and he was accompanied by correctional officers when escorted in restraints.

Plaintiff provides no argument in response to Defendants' failure to protect argument.

Although prison conditions may be, and often are, restrictive and harsh, prison officials "must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 486 U.S. 517, 526-27 (1984)). "[P]rison officials have a duty … to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (citations and quotations omitted); *see also Cortez v. Skol*, 776 F.3d 1046, 1050 (9th Cir. 2015). To establish a violation of this duty, the prisoner must establish that prison officials were "deliberately indifferent" to serious threats to the inmate's safety. *Farmer*, 511 U.S. at 834; *see also Labatad v. Corr. Corp. of Amer.*, 714 F.3d 1155, 1160 (9th Cir. 2013) (citation omitted).

First, "the deprivation alleged must be, objectively, sufficiently serious." When a plaintiff claims prison officials failed to take reasonable steps to protect, the plaintiff must show that 'he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834 (citations omitted). Second, the inmate must satisfy the objective element. This means the prison official must "know of and disregard an excessive risk to inmate health or safety[.]" *Id.* at 837.

The court agrees that where Plaintiff has provided no specific facts concerning any danger he faced as a result of being in shackles near other inmates were not shackled, Plaintiff

46

has not created a genuine dispute of material fact as to the objective element of his failure to protect claim.

Moreover, as with all of his other claims, he has not provided evidence that establishes a link between each named Defendant in this claim and the alleged constitutional violation so as to show each Defendant knew of and disregarded a risk to his safety.

For these reasons, summary judgment should be granted in Defendants' favor as to the Eighth Amendment failure to protect claim in Count XII.

**3. Equal Protection**

Plaintiff asserts a "class of one" equal protection claim against McDaniel, Neven, Foster, Sisco, Deal, Williams, Baker, Byrne, Fletcher, Gittere, Caseworker Sandoval, Moore and Southworth based on allegations that general population inmates in other units are similarly situated to him and are treated differently from general population inmates in Plaintiff's unit because they are not required to be restrained, and there is no rational basis for the differential treatment.

Defendants have provided evidence that inmates in ad-seg, similarly situated to Plaintiff, are restrained in the same manner as Plaintiff. In his response,  Plaintiff provides no argument, let alone evidence, to create a genuine dispute of material fact that he was similarly situated to those in general population. Nor has he pointed to any evidence that he was treated differently than those similarly situated to him in either ad-seg or, if they were similarly situated to him, in general population. Therefore, summary judgment should be granted in Defendants' favor as to the equal protection claim in Count XII.

## **IV. RECOMMENDATION**

IT IS HEREBY RECOMMENDED that the District Judge enter an order **GRANTING** Defendants' Motion for Summary Judgment (ECF No. 122).

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: January 25, 2021

William G. Cobb
United States Magistrate Judge